777 So.2d 1242 (2001)
Michael STANTON
v.
TULANE UNIVERSITY OF LOUISIANA, The Administrators of the Tulane Educational Fund and Donna V. Robertson, Dean, School of Architecture.
No. 2000-CA-0403.
Court of Appeal of Louisiana, Fourth Circuit.
January 10, 2001.
Writ Denied April 12, 2001.
*1243 Rebecca M. Goforth, Barbara G. Haynie, House, Kingsmill & Riess, L.L.C., New *1244 Orleans, LA, Counsel for Plaintiff/Appellant.
G. Phillip Shuler, III, Richard B. Ramirez, Julie D. Livaudais, Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., New Orleans, LA, Counsel for Defendant/Appellee.
Court composed of WALTZER, McKAY and KIRBY, Judges.
WALTZER, Judge.

STATEMENT OF THE CASE
On 16 May 1995, plaintiff, Michael Stanton, sued Tulane University, The Administrators of the Tulane Educational Fund (Tulane) and Donna V. Robertson, Dean of the Tulane School of Architecture, for breach of and tortious interference with an alleged employment contract between Tulane and Stanton, seeking damages for emotional distress, actual damages and general damages including loss of reputation and inconvenience.
Tulane and Dean Robertson answered, alleging among affirmative defenses that Stanton was an at-will employee who was terminated for cause, that no contract existed between defendants and Stanton, and that all statements made by Tulane representatives were true, made in good faith and stated only to those with a need to know.
By amending petition, Stanton sought trial by jury.
The record shows that discovery was begun in April, 1997. The matter was set for pre-trial conference in May, 1998. Additional discovery was made and a discovery cutoff of 20 December 1998 was set by the trial court. By joint motion discovery was extended to 10 February 1999.
Following the completion of discovery, Tulane and Dean Robertson filed a Motion for Summary Judgment on 19 March 1999. By judgment of 23 August 1999, the trial court granted the motion. From that judgment, Stanton appeals. We affirm.

STATEMENT OF FACT
We find no written reasons for judgment in the record. The transcript of the argument on the Motion for Summary Judgment shows the following comment by the trial judge: "I don't find that the handbook is a contract, and I don't find an implied contract, so I'm going to grant the motion for summary judgment."
According to the Statement of Undisputed Material Facts submitted by Tulane and Dean Robertson:
1. Stanton was hired as a Probationary Assistant Professor in the Tulane School of Architecture effective 1 July 1989.
2. This was a "tenure-track" position.
3. The Tulane Faculty Handbook states in its Introduction that it is "a general guide to the policies and operations of Tulane University."
4. The full procedure for reappointment of probationary faculty at Tulane is set forth in the Faculty Handbook.
5. The Handbook requires a third year review by faculty, which Stanton received.
6. The three-member Promotions and Tenure Committee voiced specific concerns regarding Stanton in all three areas of review: Teaching Effectiveness, Research and Publication, and Community Service/Collegiality.
7. The third year review committee recommended that Stanton demonstrate sufficient progress in those three areas within the 1993-94 academic year, and then undergo a fourth year review to determine whether these areas had been addressed.
8. The Handbook states that reviews of non-tenured faculty may take place in any year.
9. Stanton underwent a fourth year review according to handbook procedure.
10. The three-member Promotions and Tenure Committee found that Stanton *1245 failed to satisfy two of the three requirements established following his third year review.
11. Both Dean Robertson and Tulane Provost James Kilroy reviewed the Committee's decision as set forth in the handbook and in the School of Architecture Constitution.
12. Both Kilroy and Dean Robertson found that Stanton's failure to satisfy two of the three requirements established following the third year review constituted "exceptional circumstances" warranting a reversal of the Promotions and Tenure Committee's decision. This process is provided for specifically in the handbook.
13. Stanton's appeal of the non-reappointment decision was denied by the Tulane Senate Committee on Faculty Tenure, Freedom and Responsibility.
We have reviewed the documents filed below in connection with Tulane's Motion for Summary Judgment and find these facts to be undisputed.
Tulane hired Stanton by letter dated 30 May 1989 from Ronald C. Filson, then Dean of the Tulane School of Architecture, to Stanton. That letter provided in pertinent part:
... I am happy to offer you an appointment in the School of Architecture at Tulane University for the 1989-90 academic year. The rank will be that of Assistant Professor with an academic year salary of $26,000. This nine-month salary will be payable in 12 monthly installments, the first on July 31, 1989....
Positions are reviewed on an annual basis with consideration given to both academic and professional performance and to the academic needs and resources of the school. Specific reviews take place at the end of your first year, at the end of the third year, and in the penultimate year of your probationary period. If this review is favorable, it leads to the awarding of tenure ...
The letter also contains details of the Tulane retirement and health plans. The record contains a copy of Stanton's acceptance letter dated 1 July 1989, in which he acknowledged that he would be reviewed for tenure.
On 1 July 1991, Dean Filson advised Stanton by letter of the approval of his continuation on the faculty for the 1991-92 academic year, offering a salary of $29,000 plus $4,270 in fringe benefits.
Following Stanton's first year equivalent review, a divided Spring 1990 Promotion and Tenure Committee recommended that Stanton be continued in his then current position and tenure track with the following observations: (1) that he pursue professional registration; (2) that his classroom teaching and evaluations be closely monitored because of student complaints, particularly in regard to his partiality shown toward certain students in critiques and grading; and (3) opinions of his School of Architecture colleagues be sought and evaluated as differing opinions had been found by the Committee in regard to Stanton's classroom performance and impartiality.
The report of Stanton's third year review, dated 16 February 1993, presents an even more troubling picture. While recognizing his strength as a positive, involved and supportive design instructor and his valuable background in theory and history, together with his introduction of a foreign study program in Venice, Italy, the Promotions and Tenure Committee designated several serious areas of concern: (1) Stanton's research remained unpublished; (2) it was difficult to identify Stanton's contributions to design competition work performed jointly with other junior faculty members and students; (3) his lack of a license constitutes lack of an "essential professional credential for tenure"; (4) he made very little connection with the New Orleans community; (5) he had not demonstrated an interest in Tulane activities. The committee concluded by recommending:

*1246 "Despite Michael Stanton's many strong qualities as teacher, entrepreneur and writer, his attitude toward the rest of the faculty has created too many problems. If a tenure vote were to be taken today, it is doubtful that he would receive any significant support. It is worth examining the nature of this opposition. To what degree does it result from a history of unfortunate incidents and misunderstandings and to what degree does it reflect fundamental attitudes which can lead to further difficulties:
"A healthy faculty agrees to disagree. Issues are professional not personal and differences are on the basis of issues not personalities or allegiances. Professor Stanton has made it clear from his first encounter with the school, that he considers himself superior to the faculty. In rejecting this community, he has isolated himself. He is only willing [sic] to work with a few junior faculty members. This isolation reinforces the impression of rejection and contempt. In order to receive tenure and gain acceptance as a member of this faculty, Professor Stanton will need to demonstrate that he is willing to fully enter [sic] this community as an equal. He will need to overcome personality traits and a history of misjudgments. That means he must work with his colleagues and demonstrate his support and interest. Without establishing this goodwill, the promotions and Tenure Committee believe that he would not receive sufficient support by the faculty for tenure."
Dean Robertson's confidential letter of 26 February 1993 to the Tulane Provost reflects her own doubts as to Stanton's suitability for tenure at Tulane. She refers to his domination of the seminar format of his theory courses, stifling student discussion, showing favoritism to stronger designers in his studio courses, condescension in his comments on student design work and negativity in critiquing students and faculty. She noted that his failure to invite broad faculty participation in his design studios isolates his courses from all but a small clique of mostly junior faculty, and notes that in the context of an architectural school, all faculty should be involved. She pointed out that although Stanton founded the Venice foreign study program, the curriculum is overseen by the school's Curriculum Committee and the Dean and Stanton selects neither the students nor faculty who participate in the program. The Dean pointed out that Stanton's publications have not been entirely refereed and questioned whether he would be able to achieve appropriate publication in the future. She described his work as "not terribly original" and criticized the fact that he denigrates virtually every architectural theorist working in America today in favor of a vague endorsement of European theory, "with a condescending and dismissive tone unearned through his own experience or reputation to date." She referred to evidence of "too separated a personality, one who wishes to operate outside the structure of normal academic procedures." She pointed out that Stanton's hostile interactions with faculty created "deep pockets of enmity" at Tulane, and that tenured faculty were "deeply suspicious" of any attempted "rehabilitation." The Dean suggested that if it would be doubtful that Stanton would be tenurable, it would be in his best interests and in the best interests of the institution that the relationship be terminated after a fourth, terminal year of appointment. She concluded that his teaching evaluations were mixed, his writing work was of uneven quality, his design work diagrammatic and he lacked commitment to registration or professional practice.
The Dean communicated these concerns to Stanton by letter of 15 June 1993, which concluded:
The Promotions and Tenure Committee recommends that you be reappointed for one year, and that recommendation has been accepted by the Provost and *1247 me. In this next year, another careful review will be conducted ...
In addition to the review of your teaching, scholarship and service, a few specific requirements have been stipulated:
1. Significant progress ... toward obtaining your professional license, as shown by passing at least a portion of the Registration exam.
2. ... ample demonstration of superior design work of your own authorship.
3. ... significant progress in becoming an effective member of this faculty.
... Be sensitive to your teaching methods: listen to students and afford them respect. [Emphasis added.]
Following the fourth year review anticipated by the foregoing, Dean Robertson advised Stanton by letter of 6 June 1994 that the Promotions and Tenure Committee reported that he had not met the first two standards, relating to licensing and original design work. While noting some progress in regard to effectiveness, the committee noted other concerns about his contributions. As a result, the Dean concluded, the coming academic year would be Stanton's terminal year of appointment.
On 20 September 1994, Stanton appealed this decision to the University Senate Committee on Faculty Tenure, Freedom and Responsibility. The appeal was unsuccessful.
We have reviewed the handbook that Stanton contends constitutes a valid, enforceable contract between him and Tulane, and find the following provisions to be pertinent:
I. INTRODUCTION This Handbook is intended as a general guide to the policies and operation of Tulane University. For detailed, comprehensive information on the constitutions of the faculties, the regulations of departments, and matters such as benefits, faculty members should refer to the offices of their dean, their department chair and the Personnel Office. The information in the Handbook is current at the date of its issuance[July, 1986], but much of it is presented in summary form and nearly all of it is subject to amendment.
* * *
III. POLICIES CONCERNING FAULTY APPOINTMENT AND RESPONSIBILITY
A. STATEMENT ON ACADEMIC FREEDOM, TENURE, AND RESPONSIBILITIES
Article II Appointments
Section 1. The conditions of each appointment, including salary, rank, term of appointment and tenure, shall be stated and confirmed to the faculty member in writing by the dean of the school or college. Any subsequent extensions or modifications of an appointment, and any special understandings shall be stated and confirmed in writing by the dean of the school or college.
* * *
Section 6. A regular appointment may be ... probationary, with the prospect of tenure.
* * *
Article III Probationary Regular Appointments
Section 1. The purpose of the probationary period is to provide opportunity for demonstration of the suitability of the appointee for an appointment with permanent tenure at Tulane University.
Section 2. Appointment during the probationary period shall normally be for a period of one year at a time.
Section 3. The probationary period shall not exceed seven years, ...
* * *
Section 7. In the case of regular faculty appointments, a department is required, not later than April of the third *1248 year of a faculty member's service, to recommend to the dean and the college or division tenure committee whether the faculty member should be reappointed or terminated. The department shall give reasons, supported by evidence, to show that the faculty member has or has not made satisfactory progress toward meting the criteria for tenure. If a tenure committee concludes that the faculty member has not made satisfactory progress, the faculty member shall be notified that the appointment will terminate at the end of the fourth year. A similar review should be conducted when a final tenure decision is required. These reviews should be conducted rigorously by the department, the college or division tenure committee, and the administration to insure high standards of quality in the tenured faculty. It should be understood by all concerned that the existence of a tenure position does not imply any assurance that the probationary candidate for that position will in fact receive tenure unless the candidates fully meets the criteria for tenure at the time of the final review. The third-year review in no way precludes reviews or limitations of appointments by departments, colleges, or schools during other years of a faculty member's probationary period.

STANDARD OF REVIEW
Appellate courts review summary judgment de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, 99-2257 (La.2/29/2000), 755 So.2d 226, 230 (2000).
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of actions such as this. The procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966 A(2). A summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966 B.
The burden of proof remains with the movant. However, if, as here, the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La. C.C.P. art. 966 C(2).
An adverse party to a supported motion for summary judgment may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided by law, must set forth specific facts showing that there is a genuine issue of material fact for trial. La.C.C.P. art. 967; Townley v. City of Iowa, 97-493 (La.App. 3 Cir. 10/29/97), 702 So.2d 323, 326.
The amended article 966 substantially changed the law of summary judgment. Under the prior jurisprudence, summary judgment was not favored and was to be used only cautiously and sparingly. The pleadings and supporting documents of the mover were to be strictly scrutinized by the court, while the documents submitted by the party in opposition were to be treated indulgently. Any doubt was to be resolved against granting the summary judgment, and in favor of trial on the merits. This jurisprudential presumption against granting the summary judgment was legislatively overruled by La.C.C.P. art. 966 as amended. The amendment levels *1249 the playing field between the parties, with the supporting documentation submitted by the parties to be scrutinized equally and the removal of the overriding presumption in favor of trial. Under the amended statute, the initial burden of proof remains with the mover to show that no genuine issue of material fact exists. However, under La.C.C.P. art. 966(C), once mover has made a prima facie showing that the motion should be granted, the burden shifts to the non-moving party to present evidence demonstrating that material factual issues remain. Once mover has properly supported the motion for summary judgment, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. The amendment to La.C.C.P. art. 966 bring Louisiana's standard for summary judgment closely in line with the federal standard under Fed. Rule Civ.Proc. 56(c). Hayes v. Autin, 96-287 (La.App.3 Cir. 12/26/96); 685 So.2d 691, 694, writ denied, 97-0281 (La.3/14/97), 690 So.2d 41. The summary judgment law was amended by La.Acts No. 483 of 1997 to incorporate the Hayes analysis.
Under Fed.Rule Civ.Proc. 56, when the non-moving party bears the burden of proof at trial, there is no genuine issue of material fact if the non-moving party cannot come forward at the summary judgment stage with evidence of sufficient quantity and quality for a reasonable juror to find that the party can satisfy his substantive evidentiary burden. In construing the federal summary judgment rule, the United States Supreme Court held that summary judgment shall be granted where the evidence is such that it would require a directed verdict for the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a defendant in an ordinary civil case moves for summary judgment or a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the non-moving party on the evidence presented. Id. The Anderson court further held that the mere existence of a scintilla of evidence on the non-moving party's position would be insufficient; there must be evidence on which the jury could reasonably find for that party. In Lujan v. National Wildlife, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), the court held that Fed.Rule Civ. Proc. 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof. Berzas v. OXY USA, Inc., 29,835 (La.App. 2 Cir. 9/24/97), 699 So.2d 1149, 1152-53; Martello v. State Farm Fire and Cas. Co., 96-2375 (La.App. 1 Cir. 11/7/97), 702 So.2d 1179, 1183-84, writ denied 98-0184 (La.3/20/98), 715 So.2d 1215.
A fact is material if it is essential to a plaintiff's cause of action under the applicable theory of recovery and without which plaintiff could not prevail. Generally, material facts are those that potentially insure or preclude recovery, affect the litigant's ultimate success, or determine the outcome of a legal dispute. Prado v. Sloman Neptun Schiffahrts, A.G., 611 So.2d 691, 699 (La.App. 4 Cir.1992), writ not considered 613 So.2d 986 (La.1993).

FIRST ASSIGNMENT OF ERROR: The trial court erred in concluding that plaintiff could not maintain a claim for breach of contract and that defendants were entitled to summary judgment.
In order to prevail on a breach of contract claim, Stanton must first prove the existence of a contract between him and Tulane. In response to a defense interrogatory asking identification of the alleged contract, Stanton responded:
A contract of employment exists between [Stanton] and the defendant and the terms of the Tulane University Faculty *1250 Handbook which sets forth the Universities' [sic] employment policies, rules and regulations govern the employment contract between the parties. Thus, the entire faculty handbook constitute [sic] a contract of hire. In the case at bar, this contract is the Handbook published as of July 1986. Those parts of the handbook which specifically apply to the issues at hand can be found in chapter [sic] II, III and IV beginning at page 2 through page 41. Further, the School of Architecture Policy for Faculty published February 1981 and the Constitution of the School of Architecture clearly delineates [sic] the criteria by which decisions will be rendered within the school pertaining to issues of advancement, tenure and the issues at bar.
The handbook begins with the following comment:
This Handbook is intended as a general guide to the policies and operation of Tulane University.
Stanton admitted in his deposition that the Handbook provisions were not modified or adapted for him, and that he did not negotiate for specific language concerning reappointment or employee status.
The contention that a handbook creates a contract between an otherwise "at will" employee and his employer is neither novel nor, in this jurisdiction, meritorious.
Louisiana recognizes a presumption favoring at will employment. Stanton contends that the Tulane Handbook is, in fact, a contract that takes his employment relationship outside the "at will" category. In 1986, this Court held that a similar Tulane handbook was not such a contract. In Wall v. Tulane University, 499 So.2d 375, 376 (La.App. 4 Cir.1986), writ denied, 500 So.2d 427 (La.1987) this Court affirmed a summary judgment in favor of Tulane holding:
The Handbook appears to be primarily informational in nature and did not, in our opinion, constitute a binding promise by Tulane to continue indefinitely the benefits described therein.
Mix v. The University of New Orleans, 609 So.2d 958, 964 (La.App. 4 Cir.1992), writ denied, 612 So.2d 83 (La.1993) reached a similar result in the case of UNO's assistant director of physical plant, who relied on provisions of UNO's "Grievance Procedure for Unclassified Personnel." In affirming the trial court's summary judgment in favor of UNO, this Court surveyed employment law jurisprudence and concluded:
(1) There are no Louisiana cases holding that employee manuals, policies, or grievances procedures confer any contractual rights upon employees or create any exceptions to the "employment at will" doctrine.
(2) Several Louisiana cases have held that employee manuals as well as company policies and procedures do not confer contractual rights upon employees nor create any exceptions to the "employment at will" doctrine. [Citations are omitted.] ... Therefore, we hold that the University Grievance Procedure created no contractual rights in favor of Mix. Consequently a determination of whether those procedures were properly followed is irrelevant and raises no genuine issue of material fact.
(3) The employee's "expectation" that the University would adhere to the provisions of the Grievance Procedure does not give him any legal rights. [Citation omitted.]
(4) The reasons for termination need not be accurate, fair or reasonable.... The question of why Mix was terminated is irrelevant and consequently raises no genuine issue of material fact.
This Court reaffirmed the employment at will concept in the context of a full-time probationary faculty member at Loyola University in New Orleans and provided an interesting analysis of the distinction between tenured and non-tenured positions in Schalow v. Loyola University of New Orleans, 94-0797 (La.App. 4 Cir. *1251 11/30/94), 646 So.2d 502. The Court held that any ambiguity in the employment relationship should be construed in favor of employment at will. Schalow, supra at p. 5, 646 So.2d at 505. The opinion also points out cogently that to interpret the handbook in such a way as to give the nontenured employee job security would be to eliminate the significant distinction between tenured and non-tenured employees.
Tulane's faculty handbook was at issue in Schwarz v. The Administrators of the Tulane Educational Fund, 97-0222 (La. App. 4 Cir. 9/10/97), 699 So.2d 895. This Court affirmed Tulane's summary judgment, holding:
This court has recognized that a grievance procedure handbook is a unilateral expression of company policy, and that the publishing of that policy does not evidence a meeting of the minds. The terms of such a handbook were not bargained for by the parties and any benefits conferred by it are mere gratuities. [Citation omitted].
* * *
"[T]he historical purpose of tenure, which originated in higher education, was the protection of academic freedom by preventing arbitrary or repressive dismissal." [Citations omitted.] However, the converse is also true: implicit in the status of non-tenured/probationary employee is the assumption that protection against arbitrary or repressive dismissal is absent, i.e., the doctrine of employment at will prevails. [Citing Schalow, supra at p. 5, 646 So.2d at 505].
Louisiana jurisprudence clearly and unequivocally upholds the principle that this sort of employment handbook is not a contract such as would eliminate application of the employment at will doctrine. We are not persuaded that we should abandon our jurisprudence constante in favor of the approaches suggested by Stanton in brief, relying on the perceived wisdom of other jurisdictions and foreign commentators.
This assignment of error is without merit.

SECOND ASSIGNMENT OF ERROR: The trial court erred in concluding that an exception to the employment at will doctrine should not be applied to plaintiffs case.
Stanton suggests that we depart from the continuous line of Louisiana jurisprudence discussed above and engraft on our state's employment law an implied contract exception to the employment at will doctrine. Stanton argues that such a concept would defeat employment at will where a plaintiff can prove "implied in fact promises of employment for a specific duration, or by showing reliance on a promise of job security."
In addition, Stanton would rely on jurisprudence in other states that he contends creates a "covenant of good faith and Fair Dealing" exception to employment at will, and, alternatively, would have this Court recognize an enforceable property right arising out of an employee's "expectation of continued employment." This expectation theory was rejected specifically in Mix, supra, 609 So.2d at 964. Absent a contract of employment, these concepts remain foreign to the scheme of Louisiana employment law.
We find nothing in the cited law review commentaries or cases from foreign state jurisdictions that compels such a result. Furthermore, even were we to accept Stanton's legal argument, which we emphatically do not, he has failed to offer evidence tending to establish the predicate for its application.
This assignment of error is without merit.

THIRD ASSIGNMENT OF ERROR: The trial court erred in failing to distinguish jurisprudence of this Court involving factual circumstances that clearly differ from plaintiff's situation.
For the reasons stated in our discussion of the First Assignment of Error, this assignment is without merit.

*1252 FOURTH ASSIGNMENT OF ERROR: The trial court erred in concluding that Tulane did not breach its contract with plaintiff.
Having found that there was no employment contract between the parties, we find no breach. The conditions under which Stanton ultimately was terminated are therefore irrelevant. See, Mix v. University of New Orleans, supra, 609 So.2d at 964. This assignment of error is without merit.

FIFTH ASSIGNMENT OF ERROR: The trial court erred in failing to rule on the issue of whether or not plaintiff could maintain claims for intentional interference with contract and intentional infliction of emotional distress against the defendants.
Because of our conclusion that the trial court correctly found there was no employment contract between the parties, there can be no actionable claim for tortious interference with a contract.
The claim of intentional infliction of emotional harm is likewise without merit. In order to prevail at trial, Stanton had the burden of proving (1) that defendants' conduct was extreme and outrageous; (2) that the emotional distress he suffered was severe; and (3) that defendants desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from their conduct. White v. Monsanto Co., 585 So.2d 1205, 1209 (La.1991). Stanton must show conduct so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Id. Liability does not attach where the actor has done no more than to insist on his legal rights in a permissible way, even though he is aware that such insistence is certain to cause emotional distress. Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases where plaintiff proves a pattern of deliberate, repeated harassment over a period of time. White, supra 585 So.2d at 1210. Plaintiff presented no evidence of intentional infliction of emotional distress. Therefor, this claim properly was dismissed by the trial court. This assignment of error is without merit.
CONCLUSION AND DECREE
For the foregoing reasons, we affirm the judgment of the trial court and assess the costs of this appeal to appellant, Michael Stanton.
AFFIRMED.