REVISED MAY 23, 2008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

April 16, 2008

Charles R. Fulbruge III
Clerk

No. 07-30506

RENEE S. HARTZ, MD,

                                  Plaintiff-Appellee,

v.

ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND;
UNIVERSITY HEALTHCARE SYSTEM L.C. (Columbia/HCA), doing
business as Tulane University Hospital and Clinic,

                                  Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:06-CV-02977

Before KING, STEWART, and PRADO, Circuit Judges.

PER CURIAM:[*]

    After Plaintiff-Appellee Renee Hartz, M.D., was denied tenure by the Tulane School of Medicine, she brought a Title VII and breach of contract lawsuit against the school and hospital where she worked. She alleges that the denial of tenure was based on her sex and in retaliation for her previous equal

---

    [*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

employment opportunity activities. She also alleges that under the terms of the faculty handbook she had already acquired de facto tenure, and that her termination upon the denial of tenure was therefore a breach of contract. While the district court denied, in part, motions to dismiss for failure to state a claim brought by the school, the Administrators of the Tulane Educational Fund ("Tulane," the operator of the Tulane School of Medicine), and the hospital, University Healthcare System LC ("UHS," the owner of Tulane University Hospital and Clinic ("TUHC")), it certified an interlocutory appeal which this Court accepted. For the following reasons, we REVERSE and DISMISS.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     Background Facts

Hartz was hired as a professor of surgery at the Tulane School of Medicine in July 1997, after previously serving as a tenured professor at two medical schools in the Chicago area. Hartz was appointed to a three-year tenure track position at the medical school. Shortly thereafter, though, she lost her surgery privileges at TUHC. This had a negative effect on her ability to perform her duties as a professor, and, in 1999, Hartz was denied tenure. She filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), claiming that the chairman of the surgery department, Dr. Robert Hewitt, had discriminated against her on the basis of sex and retaliated against her for pursuing a sex discrimination claim through internal procedures.

Despite her EEOC charge, Hartz was offered an additional three-year term of employment, beginning July 1, 2000. The university president, Scott Cowan, explained in a letter to Hartz that she would have the opportunity for tenure review in the second year of this term, but that if she did not receive tenure, her employment would terminate at the end of the three-year term. Hartz accepted this new term of employment, and was up for tenure for a second time in the spring of 2002.

On May 20, 2002, the Personnel and Honors ("P & H") committee, composed of senior medical school faculty, voted to recommend Hartz for tenure. This recommendation was passed on to the Executive Faculty Committee ("EFC") of the medical school, and on June 21, 2002, Hartz learned that the EFC had voted against accepting the P & H committee's recommendation. Subsequently, the matter was sent back to the P & H committee, which once again voted to recommend tenure. On July 16, 2002, the matter was again before the EFC, which rejected the recommendation of the P & H committee. By letter of July 17, 2002, the dean of the medical school notified Hartz that he was accepting the recommendation of the EFC, and that 2002-2003 would be her terminal year at the university.

On October 19, 2002, Hartz filed a complaint with the medical school's Grievance Committee, alleging gender discrimination, retaliation, and failure to be afforded due process. She also asked that the Grievance Committee adjudicate the denial of tenure that she had received on July 16, 2002. The Grievance Committee concluded that there was no basis for gender discrimination, that there did not appear to be a clear pattern of retaliation, and that Hartz had been afforded every opportunity to present her case at multiple levels within the medical school. However, the Grievance Committee recommended that Hartz be granted tenure because: (1) the P & H committee twice recommended tenure; (2) the Executive Committee's overruling of the P & H committee violated Hartz's right to due process; and (3) the faculty handbook indicated that she had de facto tenure (by virtue of the fact that she had received the three-year extension after her initial term of employment expired).

The dean of the medical school then appealed the Grievance Committee's decision to the university provost, who rejected the conclusions of the Grievance Committee and affirmed the decision to deny tenure. Hartz appealed the

provost's decision to the Faculty, Freedom, and Responsibility Committee, which recommended that the denial of tenure be upheld. The university president thereafter approved this decision on May 28, 2003. Hartz's three-year term expired on June 30, 2003, and she was discharged.

On August 22, 2003, Hartz filed a charge of discrimination with the EEOC against the "Tulane Health Science Center," alleging sex discrimination and retaliation for previous EEO activity. She specifically complained about the denial of tenure, as well as discrimination on account of sex, hostile work environment, and retaliation by her supervisor. The EEOC issued Hartz a right to sue letter dated March 15, 2006.

B.     This Lawsuit

Hartz brought suit in the Eastern District of Louisiana on June 8, 2006. She named as defendants Tulane and UHS.

Hartz alleges that the Tulane School of Medicine and TUHC (and, thus, Defendants-Appellants Tulane and UHS) acted in concert to discriminate and retaliate against her. Her allegations focus to a large extent on the conduct of her supervisor, the chairman of the surgery department, Hewitt, who was also a member of the EFC, which twice rejected the P & H committee's recommendation that Hartz receive tenure. Hartz alleges that Hewitt discriminated against her on the basis of sex, created a hostile work environment, and retaliated against her on account of previous EEO activity. According to the complaint, Hewitt "misrepresented [Hartz's] clinical and academic performance," prevented residents from assisting her at the hospital, was responsible for her losing surgery privileges at the hospital, put up a "vigorous opposition" to Hartz's tenure application when the P & H committee was considering it (by writing a letter to the committee), and served on the EFC but did not abstain when it voted on Hartz's tenure.

Hartz alleges that the decision to deny tenure was the product of sex discrimination and retaliation. She also alleges that the discriminatory and retaliatory conduct she complains of was a continuing violation of Title VII that began shortly after her arrival at Tulane in 1997 and lasted until the Tulane president approved the denial of tenure on May 28, 2003.

Hartz also alleges that under the terms of the Tulane faculty handbook, she had received de facto tenure, and that her termination was in breach of contract. Hartz claims that the handbook provides that a professor who has previously been tenured at another university (as Hartz had) and who continues as a professor past the initial probationary term of employment has automatically received tenure.

Tulane and UHS both filed motions to dismiss under Rule 12(b)(6) for failure to state a claim. Tulane argued that Hartz's charge of discrimination was not timely filed with the EEOC, since she was obligated to file her charge within 300 days of the alleged discrimination. It also asserted that Hartz's EEOC charge was untimely because: (1) the date on which the limitations period begins to run is the date of the notice of termination, not the final date of employment; and (2) Hartz was notified both on June 21, 2002 and July 17, 2002, that tenure had been denied; but (3) Hartz did not file with the EEOC until August 22, 2003—nearly 400 days after she received notice of the EFC's second rejection of the P & H committee's favorable recommendation. Tulane further asserted that the fact that Hartz pursued internal grievance procedures did not toll the limitations period.

UHS filed a separate 12(b)(6) motion in which it echoed Tulane's arguments regarding the timeliness of the EEOC charge, but also argued that it was not amenable to suit because it had not been named as a respondent in Hartz's EEOC charge, and thus never had notice of or an opportunity to respond to the charge. UHS also argued that Hartz's breach of contract claim had no

bearing on UHS, because UHS could not be considered a party to any contract arising from the faculty handbook.

In response to the motions to dismiss, Hartz argued that the limitations period for filing with the EEOC did not begin to run until May 28, 2003, when the Tulane president approved the denial of her tenure. She also asserted that her complaint alleges a continuing violation of Title VII, the last occurrence of which was on May 28, 2003. Finally, in response to UHS's argument that it was not named in the EEOC charge, Hartz argued that there is an identity of interest between Tulane and UHS, such that an EEOC charge against one served as a charge against the other. Specifically, Hartz stated that she named the "Tulane Health Science Center," that the EEOC had found no distinction between the medical school (operated by Tulane) and the hospital (owned by UHC), and that the two are components of the "Tulane Health Sciences Center."

The district court agreed that UHS was not a party to any contract based on the faculty handbook, and dismissed the breach of contract claim against UHS.[1] However, it refused to dismiss the breach of contract claim against Tulane, finding that "although several Louisiana state court cases suggest a faculty handbook is not a contract, there is no per se rule." The court held that a determination of this issue would be "premature" since the handbook had not yet been filed in the record. The court also found, in a single sentence, a clear identity of interest between Tulane and UHS. Further, while the district court acknowledged that Hartz's denial of tenure claim was time-barred and seemed ready to accept the argument of Tulane and UHS that Hartz's denial of tenure claim was therefore unavailable, the court left open the possibility that the denial of tenure might be actionable under a continuing violation theory, presumably as part of her hostile work environment claim, or that equitable

---

[1] This determination of the district court was not contested by Hartz on appeal, and thus, it is not before this Court.

tolling might apply. Therefore, the district court, observing that all doubts as to the sufficiency of Hartz's claims must be resolved in her favor, denied the motions to dismiss with respect to the Title VII claims.

Tulane and UHS both moved to certify the district court's order for interlocutory appeal under 28 U.S.C. § 1292(b). The district court agreed that the order involved a controlling question of law, and certified an appeal as requested. On June 13, 2007, this Court granted the petitions of Tulane and UHS seeking leave to appeal from the interlocutory order.

## STANDARD OF REVIEW

On interlocutory appeal, this court reviews de novo the district court's order on a motion to dismiss for failure to state a claim under Rule 12(b)(6). See In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007). The "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004) (quoting Jones v. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 1965 (quotation marks, citations, and footnote omitted).

## DISCUSSION

A.    Identity of Interest

As a preliminary matter, we hold that Hartz failed to exhaust her administrative remedies against UHS because she failed to name UHS in her EEOC charge. Hartz only named "Tulane Heath Sciences Center" in her charge, but argues in her brief before this Court that it "strains the boundaries of credulity" to suggest that there is no identity of interest between Tulane and

UHS. We disagree. Tulane and UHS are separate and distinct business entities: Tulane is a non-profit educational institution whereas UHS is a for-profit limited liability company; Tulane and UHS are also domiciled at different addresses. The district court erred when it summarily concluded that there was a "clear identity of interest" between Tulane and UHS. The district court should have applied the four-factor test used in St. Cyr v. Merrill Lynch, Pierce, Fenner, & Smith, Inc., 540 F. Supp. 889, 891-92 (S.D. Tex. 1982) (citing Glus v. G. C. Murphy Co., 562 F.2d 880, 888 (3d Cir. 1977)), which asks:

> (1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; (2) whether under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceeding; (3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; (4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

Hartz's complaint is wholly lacking in any factual basis for her conclusory allegation that Tulane and UHS share an identity of interests or that their interests are so similar that it was unnecessary to include UHS in the charge. Further, she has not alleged that she was prevented from identifying UHS in her charge. Accordingly, the district court erred by not granting UHS's 12(b)(6) motion in its entirety.

B.    Denial of Tenure Claim

Tulane and UHS next contend that Hartz's Title VII claim regarding her denial of tenure should have been dismissed because Hartz failed to timely file her charge of discrimination with the EEOC. We agree.

In the state of Louisiana an employee must file her charge of discrimination with the EEOC within 300 days of the alleged discriminatory conduct. See 42 U.S.C. § 2000e-5(e); see also Janmeja v. Bd. of Supervisors of La. State University and Agricultural and Mechanical College, 96 Fed. Appx. 212, 214 (5th Cir. 2004). If the employee fails to submit a timely EEOC charge, the employee may not challenge the alleged discriminatory conduct in court. 42 U.S.C. § 2000e-5(f)(1); Ledbetter v. Goodyear Tire & Rubber Co., Inc., 127 S. Ct. 2162, 2166-67 (2007).

We have previously held that the operative date from which the limitations period begins to run is the date of notice of the adverse action, not the date that the adverse action takes effect. Clark v. Resistoflex Co., 854 F.2d 762, 765 (5th Cir. 1988); Stith v. Perot Systems Corp., 122 Fed. Appx. 115, 117 (5th Cir. 2005). This is consistent with firmly established precedent from the Supreme Court. In Delaware State College v. Ricks, 449 U.S. 250, 256 (1980), the Supreme Court held that a junior professor who was denied tenure, Ricks, failed to timely file his EEOC charge. The Court explained that the filing limitations period commenced at the time the tenure decision was made and communicated to Ricks. Id. at 258 ("the proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." (citing Abramson v. Univ. of Hawaii, 594 F.2d 202, 209 (9th Cir. 1979)). The court rejected Ricks' argument that the pendency of a grievance should toll the running of the limitation period. Id. at 261 ("[W]e already have held that the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period. The existence of careful procedures to assure fairness in the tenure decision should not obscure the principle that limitations periods normally commence when the employer's decision is made.") (internal citations omitted). The holding of Ricks was recently reaffirmed by the Supreme Court

in Ledbetter. 127 S. Ct. at 2168. Accordingly, since Hartz's EEOC charge was filed approximately one hundred days after the limitation period had expired, she is precluded from bringing her claim in federal court.[2]

Hartz's argument that the charging period did not begin to run when she initially received notice that she was denied tenure is unavailing. She attempts to distinguish Ricks by contending that, unlike in that case, she did not receive an "unbroken array of negative decisions." While it is true that the Grievance Committee recommended that Hartz be granted tenure even after the dean notified her of the EFC's decision, the Supreme Court was clear in Ricks that grievance procedures, no matter the outcome therein, do not alter the date that the limitations period begins to run. 449 U.S. at 261 ("The grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence the decision before it is made.") (emphasis in original). And as we already discussed above, Ricks also forecloses invocation of the principal of equitable tolling in this case.

C. Hostile Work Environment Claim

While it appears the district court properly recognized that Hartz's denial of tenure claim was time-barred, the district court held that under the continuing violation doctrine her hostile work environment claim was timely. Further, the district court raised the possibility that the discrete act of Hartz's denial of tenure was so "intertwined with the hostile work environment claim as to make it a component part of a larger unlawful employment practice." On appeal, Tulane and UHS argue that not only is Hartz's hostile work environment claim time-barred, but also that the district court erred in concluding that the

_____

[2] In reaching this decision, we need not decide whether the limitations period began running on June 21, 2002 (the date Hartz was first notified that she was denied tenure) or July 17, 2002 (the second date she was notified), because under either date her charge is untimely.

10

denial of tenure might be "intertwined" with the hostile work environment claim. Once again, we agree.

To prevail on a hostile work environment claim, Hartz must establish that: "(1) [she] belongs to a protected class; (2) was subjected to unwelcome sexual harassment; (3) the harassment was based on [her] sex; (4) the harassment affected a term, condition, or privilege of [her] employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action." Mota v. Univ. of Tex. Houston Health Sci. Ctr., 261 F.3d 512, 523 (5th Cir. 2001). In her complaint, Hartz sufficiently states a hostile work environment claim since she alleges that Hewitt, her supervisor, engaged in a variety of discriminatory and retaliatory activities with the apparent aim of sabotaging her career and ability to gain tenure. Nevertheless, we conclude that her EEOC charge regarding her hostile work environment claim was also untimely filed. As the Supreme Court explained in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 118 (2002), Hartz needed to file her complaint with the EEOC within 300 days of any act that allegedly contributed to the hostile work environment. While Hartz conclusorily states that "discriminatory actions began within four months of her arrival at Tulane and TUHC and continued thereafter through the remainder of her employment" and that "Dr. Hewitt's retaliation and discrimination based on sex against Dr. Hartz continued throughout her employment at Tulane," it is apparent on the face of her complaint that Hewitt's alleged actions occurred prior to the EFC's denial of tenure to Hartz in June and July of 2002.[3]

---

[3] While it is true that, when reading Hartz's complaint, some of the allegations she makes against Hewitt could be construed as falling within the charging period, we decline to do so. In her complaint, Hartz provides no dates of discriminatory or retaliatory actions against her by Hewitt or anyone else that postdate her denial of tenure. It is well established in this circuit that this Court need not accept as true conclusory allegations or unwarranted factual inferences when reviewing a district court's ruling on a 12(b)(6) motion. Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 361 (5th Cir. 2004).

Further, the district court's suggestion that the discrete act of Hartz's denial of tenure was so "intertwined with the hostile work environment claim as to make it a component part of a larger unlawful employment practice" is foreclosed by the Supreme Court's decision in Morgan. In that opinion, the Court differentiated the requirements for timely filing discrimination charges under Title VII for discrete discriminatory acts and hostile work environment claims. Id. at 110. As explained in Ricks, the clock starts running for charges of discrete discriminatory acts, such as the failure to hire, promote, or train, on the day that the act occurred, and if an employee does not timely file her complaint, that act is no longer actionable under Title VII. Morgan, 536 U.S. at 110-11. However, the Court recognized the continuing violation doctrine for hostile work environment claims. Id. at 115-18. Therefore, as long as an employee files her complaint while at least one act which comprises the hostile work environment claim is still timely, "the entire time period of the hostile environment may be considered by a court for the purpose of determining liability." Id. at 117. This holding was also affirmed in Ledbetter, where the Court explained:

> The EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination. But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed.

127 S. Ct. at 2169 (internal citation omitted).

Therefore, the district court's suggestion that Hartz's denial of tenure, an allegedly discrete discriminatory act, could be "intertwined" with her hostile work environment claim is foreclosed by Morgan and Ledbetter. While Morgan allowed the possibility that an untimely act could be used as "background

evidence in support of a timely claim," 536 U.S. at 113, Hartz cannot breathe new life into her denial of tenure claim by simply incorporating it into her hostile work environment claim.

D.    De Facto Tenure Claim

Next, we hold that the district court also erred by not dismissing Hartz's de facto tenure claim.  While we agree with the district court that Louisiana courts have never adopted a per se rule which establishes that faculty handbooks are not contracts, see Wallace v. Shreve Memorial Library, 79 F.3d 427, 431 (5th Cir. 1996); see also Oyefodun v. Dillard Univ., No. 03-0115, 2003 WL 21634305, at * 3 (E.D. La. June 26, 2003), Louisiana courts have held that the Tulane faculty handbook—the handbook at issue in this case—is not a contract.  See, e.g. Stanton v. Tulane Univ. of La., 777 So. 2d 1242, 1249-51 (La. Ct. App. 2001); Schwartz v. Adm'rs of Tulane Educ. Fund, 699 So. 2d 895, 897-99 (La. Ct. App. 1987).  Not only did those courts find that the faculty handbook to be merely an expression of policy, Id., but the court in Stanton went on to state that "Louisiana jurisprudence clearly and unequivocally upholds the principle that this sort of employment handbook is not a contract such as would eliminate application of the employment at will doctrine." 777 So. 2d at 1251.  In light of this precedent it was unnecessary for the district court to deny Tulane's motion on the basis that the determination of Hartz's de facto tenure claim "will require an in-depth analysis of the entire document;" it is untenable to conclude that Hartz's handbook contains language that would convert it into a binding policy. Once again, we repeat that it is well established that this Court need not accept as true conclusory allegations or unwarranted factual inferences when reviewing a district court's ruling on a 12(b)(6) motion.  Southland Securities, 365 F.3d at 361.

E.    Roger Phipps' Conduct

Finally, and completely separate and apart from the issues raised on appeal, we would be remiss if we did not comment on the conduct of Roger Phipps, counsel for Hartz, during oral argument in this case on Tuesday, March 4, 2008. Phipps' conduct towards the Court during argument was unprofessional. Even more serious was his admission that during his work on the case (including his preparation for argument), he had not read a key Supreme Court case. His cavalier disregard for his client's interest and for his obligation to the Court was both troubling and disgraceful.[4] Accordingly, we are ordering Phipps to provide his client, Hartz, a copy of our opinion immediately after it is released. In order to ensure compliance, we are further directing him to supply our Court with proof of service.

---

[4] An example of Phipp's interaction with the panel is included below.

Phipps: . . . so that's about all I have to say, Your Honor. I don't have anything other than that. You know, my client lives in Chicago. We communicate occasionally on the phone, she sent me the documents. And um, she's a doctor. She continues to earn a living, and she's generally unavailable if you call her because she, she's sort of a traveling doctor.

Judge: That's not much of thing you come in here and tell us, I guess.

Phipps: Well, my attitude is, the [district court] judge got it right . . . . And as far as whether even Ricks should apply, I don't think it should.

Judge: What do you do about Morgan?

Phipps: I don't, I don't, I don't know Morgan, Your Honor.

Judge: You don't know Morgan?

Phipps: Nope.

Judge: You haven't read it?

Phipps: I try not to read that many cases, your Honor. Ricks is the only one I read. Oh, Ledbetter, I read Ledbetter, and I read that one that they brought up last night. I don't know if that's not Ledbetter, I can't remember the name of it. Ricks is the one that I go by; it's my North star. Either it applies or it doesn't apply. I don't think it applies.

Judge: I must say, Morgan is a case that is directly relevant to this case. And for you representing the Plaintiff to get up here—it's a Supreme Court case—and say you haven't read it. Where did they teach you that?

Phipps: They didn't teach me much, Your Honor.

Judge: At Tulane, is it?

Phipps: Loyola.

Judge: Okay. Well, I must say, that may be an all time first.

Phipps: That's why I wore a suit today, Your Honor.

Judge: Alright. We've got your attitude, anyway.

14

CONCLUSION

For the foregoing reasons, we REVERSE the order of the district court and RENDER a judgment of dismissal for failure to state a claim. Further, Phipps is ORDERED to provide his client with a copy of this opinion and provide this Court with proof of service.