| DALE HARTLEY | * | NO. 2022-CA-0840 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| UNIVERSITY OF HOLY CROSS | * | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2019-06169, DIVISION "L"
Honorable Kern A. Reese, Judge
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Judge Rosemary Ledet, Judge Paula A. Brown, Judge Dale N. Atkins)

Jessica M. Vasquez
VASQUEZ LAW OFFICE
400 Poydras Street, Suite 900
New Orleans, LA 70130

  COUNSEL FOR PLAINTIFF/APPELLANT

Debra J. Fischman
James M. Garner
Jeffrey Darren Kessler
SHER GARNER CAHILL RICHTER KLEIN & HILBERT, L.L.C.
909 Poydras Street
Suite 2800
New Orleans, LA 70112

  COUNSEL FOR DEFENDANT/APPELLEE

        **AFFIRMED**
        **July 19, 2023**

This is an employment discrimination suit. Dr. Dale Hartley filed this suit against his former employer, University of Holy Cross ("University"). From the trial court's September 14, 2022 judgment granting University's summary judgment motion and dismissing the case, Dr. Hartley appeals. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In September 2017, University hired Dr. Hartley—an industrial-organizational psychologist—as the Director of Grant Initiatives and Accreditation Support, an administrative-staff position. In November 2018, University terminated Dr. Hartley's employment. When he was hired, Dr. Hartley signed not only a letter confirming University's employment offer, but also University's employee handbook. Dr. Victoria Dahmes was Dr. Hartley's direct supervisor. Dr. Dahmes was also University's provost and chief academic officer. In April 2018, Dr. Dahmes rated Dr. Hartley's work as commendable.

In July 2018, University posted an announcement that it was accepting applications for a vacant faculty position in its Executive Leadership Program ("ELP"). At that time, the ELP had been in existence for about three years. When University created the ELP program, it decided to staff the program with four full-time professors. Because one of the four professors resigned, University, in July 2018, posted an announcement seeking a replacement for that vacant position. Nine people, including Dr. Hartley, applied for the position. In support of his application, Dr. Hartley submitted a letter of recommendation from Dr. Dahmes.

To facilitate the selection process, University formed a twelve-member search committee that included eight students and four faculty members (the "Committee").[1] The Committee's racial composition was six African-Americans (50%), five Caucasians (42%), and one Hispanic (8%). The Committee's gender breakdown was eight females (67%) and four males (33%). The Committee divided the selection process into two parts: an application review phase and an interview phase. This case focuses on only the first part—the application review phase.

In the application review phase, each Committee member was required to rank his or her top three candidates. The criteria for ranking was the job description and the candidate's application. The Committee members' rankings were tallied, and the four top-ranking candidates were selected to move to the interview phase.

---

[1] Since the creation of the ELP program, University has formed three search committees to fill the full-time faculty positions in the ELP program. The third search committee formed in the summer of 2018—referred to in this opinion as the "Committee"—was the first one that included students as committee members.

The race and sex of the four candidates the Committee selected to move to the interview phase were as follows: one Caucasian male, two Caucasian females, and one African-American female.[2] Dr. Hartley—a Caucasian male—was not one of the four candidates selected to move to the interview phase.

The record reflects that the following undisputed events occurred from August 2, 2018—when Dr. Hartley learned that he was not selected[3]—to November 9, 2018—when Dr. Hartley was terminated:

- August 2, 2018—Dr. Hartley emailed Dr. Donaldo Batiste, the Committee's head, and Dr. Lisa Sullivan, the Committee's chair, seeking an explanation of the Committee's selection process;

- August 15, 2018—Dr. Hartley emailed University's Human Resources ("HR") Director, Christine Watts, and copied his supervisor, Dr. Dahmes, asserting a "suspected EEOC violation" and setting forth the facts that he believed created a reasonable suspicion of disparate impact discrimination;[4]

- August 19, 2018—Dr. Dahmes sent an email to Dr. David Landry—University's president—stating that "[w]e need to cut [Dr. Hartley's[5]] position as soon as possible. After talking with [Dr. Hartley], it may be time to consult the attorneys";

---

[2] Ultimately, the Committee offered the position to the African-American female. All five full-time faculty members that the University has hired for the ELP program—the four previous ones and the one hired in 2018—were the same race, African-American.

[3] In the petition, Dr. Hartley avers that he was notified "on or about" August 15, 2018. The record, however, reflects that Dr. Hartley began sending emails asking questions about the Committee's selection process on August 2, 2018.

[4] In his August 15, 2018 email in which he raised the "suspected EEOC violation" issue, Dr. Hartley articulated the factual basis for his disparate impact claim as two-fold. First, he observed that the Committee "restricted the interviews to three individuals when there were more well-qualified candidates than that." Second, he observed that the Committee was "comprised of 8 students and 4 faculty members" and that "student representation on the committee is appropriate, but students are unqualified to credential faculty."

[5] In his deposition testimony, Dr. Landry testified that he understood Dr. Dahmes' statement in this email that "[w]e need to cut this position as soon as possible" to mean that they needed to terminate Dr. Hartley's position.

- August 21, 2018—Ms. Watts and Dr. Dahmes met with Dr. Hartley to address the issue concerning the ELP faculty hiring process;

- August 22, 2018—Dr. Landry met with Ms. Watts and Dr. Dahmes to discuss their meeting with Dr. Hartley; the trio concluded that there was no discrimination and that no further action would be taken based on Dr. Hartley's complaint;

- September 7, 2018—Dr. Hartley sent an email to Dr. Dahmes stating that he was not attending a scheduled committee meeting because he was "concerned that [he] would be so skeptical and angry in the meeting that [he] would say something [he] might later regret";

- September 21, 2018—Dr. Dahmes, through University's attorney, sent a letter to Dr. Hartley reprimanding him for multiple reasons, including insubordination for refusing to attend the scheduled committee meeting; and

- November 9, 2018—Dr. Landry and Ms. Watts met with Dr. Hartley, and Dr. Landry terminated Dr. Hartley's employment.

On November 27, 2018, Dr. Hartley filed an EEOC complaint against

University.[6] After his EEOC complaint was dismissed and a right to sue letter was

---

[6] In his complaint, he averred:

I. I began employment with the above Respondent in September 2017 most recently in an administrative job. Beginning July 2018 I was denied a promotion as a Professor of Executive Leadership. After I questioned management I was informed of my discharge on November 9, 2018 by Christine Watts (H.R.) and Dr. David Landry (President). The company employs over 100 persons.

II. Dr. Victoria Dahmes (supervisor) wrote a letter of recommendation to the committee re: the above position. Dr. Dahmes stated to me, [t]hey have some adjuncts they like who are also going to apply. But I guess all the faculty in that program don't have to be black. I learned that all full-time faculty in that program were black. Also, a black person was hired for the faculty position that I applied for. In August 2018, I sent an email to Christine Watts and Dr. Dahmes re: the matter. A meeting was held and it was not nice. I was told that I was wrong and mistaken. After the meeting things began to change. Dr. Dahmes refused to talk to me anymore, from August until the deadline in October, 2018, she did not help me resolve urgent problems I was having in getting faculty to cooperate with the Board of Regents grant process and in September 2018 she sent an email asking about me taking a Friday off from work. Additionally, Dr. Dahmes sent a letter to the university attorney falsely accusing me of coercion, threats and intimidation which I deny. On the day of discharge, I was called into the office and told that I was not happy there and the university must bring the situation to a close. Also, the students in the doctoral program decided who would be interviewed and selected for the position. These students were not competent or qualified.

4

issued, Dr. Hartley filed this suit against University. In his petition, Dr. Hartley asserted the following five claims against University: (i) discrimination; (ii) retaliation; (iii) defamation; (iv) breach of contract; and (v) negligence. After answering and engaging in discovery, University filed a summary judgment motion. Following a hearing, the trial court granted University's motion and dismissed all five of Dr. Hartley's claims against it. This appeal followed.

## DISCUSSION

Although Dr. Hartley assigns multiple errors,[7] the narrow issue presented is whether the trial court erred in granting University's summary judgment motion.

### Summary Judgment Principles and Standard of Review

An appellate court reviews a trial court's judgment on a summary judgment motion *de novo*. *See Planchard v. New Hotel Monteleone, LLC*, 21-00347, p. 2 (La. 12/10/21), 332 So.3d 623, 625 (citations omitted). In so doing, an appellate court applies the same criteria that govern the trial court's decision as to whether a summary judgment motion should be granted—"whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law." *Id.*, 21-00347, pp. 2-3, 332 So.3d at 625.

---

Prior to the retaliation in response to my EEOC complaint, Dr. Dahmes considered me an excellent employee as reflected in my performance evaluation, which rated my performance as 'commendable' (highest rating) and stated that I had an 'excellent work ethic' and was 'very pleasant to work with.'

III. I believe I have been discriminated against based on my race (White) and retaliated against in violation of Title VII or the Civil Right Act of 1964 as amended.

[7] Dr. Hartley assigns as error the trial court's dismissal of his five claims—the retaliation claim, the breach of contract claim, the discrimination claim, the negligence claim, and the defamation claim. As discussed elsewhere in this opinion, Dr. Hartley failed to assign as error the trial court's refusal to allow him to file a sur-reply in connection with University's summary judgment motion.

5

The governing statutory provision states that such motion "shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(A)(3). The burden of proof on a summary judgment motion is governed by La. C.C.P. art. 966(D)(1), which provides for a shifting burden of proof.[8]

Procedurally, the pleadings a party may file in connection with a summary judgment motion are limited, by statute, to the following three: (i) the motion itself and an accompanying memorandum in support; (ii) an opposition; and (iii) a reply. La. C.C.P. art. 966(B). A sur-reply is not permitted.[9]

The summary judgment procedure is favored and shall be construed to "secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969." La. C.C.P. art. 966(A)(2). The summary judgment procedure is designed to decide if any genuine issue of material fact

---

[8] La. C.C.P. art. 966(D)(1) provides as follows:

> The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

[9] Dr. Hartley opposed University's summary judgment motion, and University filed a reply. Dr. Hartley subsequently attempted to file a sur-reply, which the trial court, pursuant to La. C.C.P. art. 966(B), refused to consider. Although Dr. Hartley raised the procedural issue of whether this was an error in his appellant brief, he failed to include this issue in his assignment of errors. *See* Rule 1-3, Uniform Rules, Courts of Appeal (providing that "[t]he Courts of Appeal shall review issues that were submitted to the trial court and that are contained in specifications or assignments of error, unless the interest of justice requires otherwise"). Nonetheless, we find this argument unpersuasive. The governing statutory provision—La. C.C.P. art. 966(B)—does not permit a sur-reply.

exists warranting a trial. *See Cutrone v. English Turn Prop. Owners Ass'n*, 19-0896, p. 7 (La. App. 4 Cir. 3/4/20), 293 So.3d 1209, 1214 (citation omitted).

A genuine issue of fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on the issue, and the granting of summary judgment is appropriate. *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 751 (citation omitted). A material fact is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Whether a fact is material must be determined based on the applicable substantive law. *Roadrunner Transp. Sys. v. Brown*, 17-0040, p. 7 (La. App. 4 Cir. 5/10/17), 219 So.3d 1265, 1270 (citation omitted); *Maddox v. Howard Hughes Corp.*, 19-0135, p. 5 (La. App. 4 Cir. 4/17/19), 268 So.3d 333, 337 (citation omitted).

Here, the applicable substantive law is three-fold: (i) the Louisiana Employment Discrimination Law ("LEDL"), La. R.S. 23:301, *et. seq.*; (ii) Louisiana contract law; and (iii) Louisiana tort law. Dr. Hartley asserts two LEDL claims—disparate impact discrimination and retaliation; one breach of contract claim; and two tort claims—defamation and negligence. We divide our analysis into these three categories.

**LEDL Claims**

LEDL mirrors federal employment discrimination law; thus, Louisiana courts look to federal jurisprudence in construing it. *See* Rick J. Norman, LA. PRAC. EMPLOYMENT LAW § 7:13 (observing that "LEDL is substantively similar to Title VII, the most comprehensive federal statute prohibiting discrimination" and that "[i]t is appropriate for Louisiana courts to consider interpretations of the

7

Title VII when construing the LEDL"); *see also Burnett v. E. Baton Rouge Par. Sch. Bd.*, 11-1851, pp. 6-7 (La. App. 1 Cir. 5/3/12), 99 So.3d 54, 59 (citation omitted).

When, as here, a plaintiff relies on circumstantial evidence to establish a LEDL claim, the *McDonnell Douglas* burden-shifting analysis applies. *See Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 321 (5th Cir.), *cert. denied*, ___U.S. ___, 211 L.Ed.2d 94, 142 S.Ct. 216 (2021).[10] Explaining the *McDonnell Douglas* burden-shifting analysis, the trial court judge, in his oral reasons for judgment, observed:

> [I]n discrimination cases . . . it's incumbent upon the plaintiff to set forth a prima facie case of disparate impact, retaliation, whatever it is. It's then the burden of the employer to show that there is a rebuttable presumption for the action that's not pretextual; that [they] had a legitimate basis for undertaking the action against the employee that they did. And then if that's established, then the employee has to go forward and show that disparate impact or retaliation, or whatever the cause of action is, they can carry a burden of proof to establish their cause of action.

The trial court, applying the burden-shifting analysis, dismissed both of Dr. Hartley's LEDL claims—disparate impact discrimination and retaliation. We separately address each of his LEDL claims.

*Disparate Impact Discrimination*

Discrimination based on disparate impact arises "from employment practices that are facially neutral in their treatment of different groups but that, in fact, impact more harshly on a protected group and cannot be justified by business necessity." Rick J. Norman, La. Prac. Employment Law § 7:4. Disparate impact

---

[10] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-26, 36 L.Ed.2d 668 (1973) (setting forth a three-part burden-shifting framework).

claims do not require proof of intent to discriminate; rather, "[such claims] focus on facially neutral employment practices that create such statistical disparities disadvantaging members of a protected group that they are 'functionally equivalent to intentional discrimination.'" *Munoz v. Orr*, 200 F.3d 291, 299-300 (5th Cir. 2000) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)).

To present a prima facie case of disparate impact discrimination, a plaintiff must prove three elements: "(1) an identifiable, facially neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two." *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 275 (5th Cir. 2008) (citation omitted).

In his petition, Dr. Hartley pled a narrow disparate impact discrimination claim arising from "the inherent bias in selecting the candidates to be interviewed." Dr. Hartley based his claim solely on the first of the two-part process of hiring an ELP faculty member—the application review phase. The trial court, in dismissing this claim, cited multiple factors, including the following three: (i) the students on the Committee had some degree of education and experience; (ii) Dr. Hartley's objection was that he was not even given an interview (the application review phase), not to the candidate's selection (the interview phase); and (iii) given Dr. Hartley's claim was limited to the application review phase, the only relevant statistic was that "three of the four [candidates selected to interview] were

9

Caucasians; one was African American." The trial court, thus, dismissed Dr.

Hartley's disparate-impact claim.[11]

On appeal, Dr. Hartley contends that there is a genuine issue of material fact regarding expert-statistical evidence and causation because all five ELP faculty members chosen in the three years the ELP program has been in existence have been the same race—African American. University counters that this is not a case in which expert-statistical evidence is needed. Regardless, University emphasizes Dr. Hartley's failure to identify the specific policy being challenged—an essential requirement for a disparate impact claim. According to University, Dr. Hartley continuously has argued that the entirety of University's hiring policy is at issue.

Addressing the disparate impact claim, we divide our analysis into two parts: expert-statistical evidence and specific policy challenged.

Expert-Statistical Evidence

In support of his argument that there is a genuine issue of material fact regarding expert-statistical evidence, Dr. Harley cites the two expert affidavits that

_____

[11] Addressing the disparate impact claim, the trial court, in its oral reasons for judgment, observed as follows:

> Dr. Hartley appeared to have been disgruntled with the process. But the fact of the matter -- and I took a note of the fact that these were not kids just out of high school, and I use "kids" in the pejorative. But these were individuals who were somewhat learned, somewhat educated, possibly out even in the workforce who had some life experience. And it was telling to me that out of 12, only two put him in their top three. . . . And then the selections that were made, the individuals who were given an interview—and only five people were interviewed—no, four, yeah, four—and three of the four, if he was making an argument for racial discrimination, three of the four were Caucasians; one was African American. And his objection was not to even be given an interview, not to the selection, which occurred apparently several weeks down the line. So that was not the complained of issue at the time.

he introduced in opposing University's summary judgment motion: (i) his own affidavit; and (ii) the affidavit of his expert, Dr. Richard Mendelson—an industrial-organizational psychologist, like Dr. Hartley.[12]

In his affidavit, Dr. Hartley attested that University: (i) appointed a largely unqualified committee; (ii) gave them no evaluation criteria; (iii) allowed them to pick their "top 3" acting alone and independently of each other; and (iv) provided them with a job description that failed even to specify the type of doctorate degree they should look for in finalists, thus creating many ways for implicit bias to infect the search process.

Dr. Hartley's expert, Dr. Mendelson, in his affidavit, attested that in Louisiana the population of Caucasians who hold a Ph.D. is not adequately represented by "the ELP selection decisions of [University], as demonstrated by the fact that just over half of the total Ph.D. holders in Louisiana are Caucasian and 0% of the Faculty in the ELP at [University] are representative of that group."

Dr. Mendelson further observed that University failed to keep adequate records as to the applicants' demographic information, as to the manner in which the applicants were rated, and as to the manner in which a determination as to which applicants would be selected was made. As a result of University's record-keeping failure, Dr. Mendleson observed that adequate data to perform an analysis was lacking. Moreover, he attested that "[i]f a program cannot be examined in a

---

[12] Both Dr. Hartley's and Dr. Mendleson's affidavits were based on their expert knowledge as industrial-organizational psychologists. In the trial court, University moved to strike both affidavits. The trial court denied the motion.

step-by-step manner to avoid the occurrence of disparate impact, it is standard practice in the fields of Human Resources and Psychology to consider the hiring process from a holistic perspective." Continuing, Dr. Mendelson observed that "the employee selection process resulted in the selection of employees that disproportionately represent a single ethnic group when compared to the population of the State of Louisiana."

Here, however, the only relevant statistic, as the trial court observed in its reasons for judgment, is that three out of the four candidates selected to interview were Caucasians. This simple statistic defeats Dr. Hartley's disparate impact claim, which is based on only the application review phase. This simple statistic shows that Caucasians were not disparately impacted in the application review selection process. For this reason, Dr. Hartley's reliance on expert-statistical evidence in an attempt to create a genuine issue of material fact is misplaced.[13]

---

[13] As University contends, three reasons support a finding that Dr. Hartley's attempt to create a genuine issue of material fact regarding expert-statistical evidence is misplaced.

First, Dr. Hartley's adverse impact claim is that he was not selected for an interview because the Committee's interview selection process was tainted by implicit bias. Given that Dr. Hartley so narrowly defined his claim, the correct sample is the pool of applicants that underwent the interview selection process. In looking at the candidates whom the Committee selected to interview, three out of the four selected candidates were Caucasians. Thus, the application review selection process did not cause a statistical disparity excluding Caucasians from interviewing for the ELP position.

Second, Dr. Hartley's suggested statistics focus on the individuals ultimately hired for the ELP position. The Committee at issue here was the third one formed to select ELP faculty members. The prior two search committees did not include students and, thus, those searches are not relevant to Dr. Hartley's disparate impact claim. Even assuming that those searches are relevant, the results of those searches cannot support a disparate impact claim. The small sample size—five ELP faculty members hired over the three-year span the ELP program has been in existence—belies such a claim. *See Robinson v. City of Dallas*, 514 F.2d 1271, 1273 (5th Cir. 1975) (observing in a case involving a practice that affected only five employees that "[s]uch small numbers are insufficient to support any conclusion as to whether the rule has a discriminatory effect").

Specific Policy Challenged

A more fundamental flaw in Dr. Hartley's disparate impact claim is his failure to satisfy the first essential element to state such a claim—an identifiable, facially neutral personnel policy or practice. *McClain*, 519 F.3d at 275. The jurisprudence has recognized that "[i]t is critical that the plaintiff identify the specific employment practice that is challenged." *Okeke v. Adm'rs of Tulane Educ. Fund*, 21-30451, 2022 WL 1025991, at *6 (5th Cir. Apr. 6, 2022) (internal quotations and citations omitted). Stated otherwise, the plaintiff must provide evidence "isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1284 (5th Cir. 1994) (citation omitted)[14]; *see also Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 800 (5th Cir. 1982).

Here, Dr. Hartley contends that he met his burden by identifying University's hiring policy. In support, he cites University's hiring policy that

------

Third, the so-called "80/20" rule cited by Dr. Hartley in his affidavit is not relevant here. The 80/20 rule—also referred to as the four/fifths rule—is an EEOC guideline that "states that a disparity of 20% will be considered evidence of adverse impact." *Arndt v. City of Colorado Springs*, 263 F.Supp.3d 1071, 1075 (D. Colo. 2017). The 80/20 rule is inapposite given the small sample size. *See* 29 C.F.R. § 1607.4 (D) (providing, in part, that "[g]reater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant"). Moreover, as University points out, the 80/20 rule is simply a "rule of thumb." *Howe v. City of Akron*, 789 F.Supp.2d 786, 797 (N.D. Ohio 2010) (observing that "[t]his statistic is considered a 'rule of thumb.' 44 Fed. Reg. 11996, 11998 (1979)" and that this statistic "is not an absolute, bright line test for adverse impact").

[14] Although a plaintiff generally must identify a specific employment practice that is the subject of the challenge, Title VII recognizes an exception to the general rule, which has been codified in 42 U.S.C. § 2000e-2(k)(1)(B). *Okeke*, 2022 WL 1025991, at *6 n.7. The exception provides that "if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i). Dr. Hartley neither cites this exception, nor establishes that University's hiring process is incapable of separation for analysis. To the contrary, his disparate impact claim is based on only the first part of the process—the selection of candidates to interview part—and not the interview part.

provides "[s]earch committee . . . will verify the qualifications of the applicants." University counters that Dr. Hartley's reliance on its hiring policy to establish his disparate impact claim is misplaced.[15] Moreover, University emphasizes that Dr. Hartley has also argued that the policy at issue is University's having no policy. In support, University cites the following three arguments Dr. Hartley advanced: (i) "it is not a delineated policy of how the search committee has to operate";[16] (ii) "there are no standardized instructions" for the search committee; and (iii) "no other instructions or tools were given" to the search committee to rank the candidates.[17] Dr. Hartley's concessions as to the absence of a specific policy, University contends, defeat his disparate impact claim. We agree.

The jurisprudence has recognized that reliance on the disparate-effect theory is not appropriate when, as here, a plaintiff has "launch[ed] a wide ranging attack on the cumulative effects of [an employer's] employment practices." *Pouncy*, 668

---

[15] In support of its summary judgment motion, University introduced Dr. Hartley's discovery responses. In his responses, Dr. Hartley identified the particular policy or practices he relied upon generically as "all [University's] policies pertaining to faculty recruitment, faculty selection, and faculty search committees," as well as the employee and faculty handbooks as a whole.

[16] As to the operation of the search committee, Dr. Hartley contends that University has no criteria to guide the search committee chair person. For this reason, he points out that some search committees are made up of small groups—three or four people; whereas, other search committees are made up of large groups. Moreover, he emphasizes that the third search committee—the one at issue here—was unique in that it was the first search committee to include student members. The prior two search committees did not include student members. Dr. Hartley contends that the student members were unqualified and incompetent to screen candidates for the position.

[17] As to search committee's ranking of candidates, Dr. Hartley contends that the only criteria for ranking was the job description and the candidate's application. He contends that University failed to provide the search committee members with any other criteria, standards, guidelines, or instructions by which to compare, contrast, evaluate, and select the candidates to be interviewed. As a result, Dr. Hartley contends that the search committee members were allowed to choose candidates based on their subjective whims and biases.

F.2d at 800. The jurisprudence also has recognized that "[s]imply because [a plaintiff-employee] refers to his own generalized observation as a 'practice' or 'policy' does not make it so." *Hanrahan v. Blank Rome LLP*, 142 F.Supp.3d 349, 354 (E.D. Pa. 2015).

Neither University's hiring process, in general, nor the absence of criteria regulating the search committee's creation and function, in particular, is sufficient to satisfy the specific employment practice requirement. Given Dr. Hartley's failure to identify a specific employment practice coupled with the lack of relevant statistical support for his claim, the trial court did not err in dismissing his disparate impact discrimination claim.

*Retaliation*

Dr. Hartley's second LEDL claim is retaliation. To establish a prima facie case of retaliation, the plaintiff must prove by a preponderance of the evidence that: (1) he engaged in an activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse employment action. *Brooks v. S. Univ. & Agr. & Mech. Coll.*, 03-0231, pp. 48-49 (La. App. 4 Cir. 7/14/04), 877 So.2d 1194, 1221. "Once the plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* "If the defendant introduces evidence, which, if true, would permit the conclusion that the adverse action was non-discriminatory, the plaintiff/employee assumes the burden of establishing that the reason or reasons

15

given were a pretext." *Id.* To do so, "the plaintiff must establish that 'but for' the

protected activity, the adverse employment action would not have happened." *Id.*;

*see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 133 S. Ct. 2517,

2528, 186 L.Ed.2d 503 (2013) (observing that a Title VII retaliation claim requires

"proof that the desire to retaliate was the but-for cause of the challenged

employment action").

The trial court found Dr. Hartley's retaliation claim unsupported because the

but-for standard for causation was not met.[18] On appeal, Dr. Hartley contends that

but for his discrimination complaint, his supervisor, Dr. Dahmes, would not have

caused his termination. He relies on the temporal proximity between his protected

activity—his discriminatory complaint—and his termination to support causation;

these events occurred four months apart. He also relies on the allegedly

inconsistent reasons voiced by Dr. Landry, University's president, for terminating

---

[18] Addressing the retaliation claim, the trial court, in its oral reasons for judgment, observed as follows:

> On the issue of retaliation, now, there's some plug-ins to that, and that is, Dr. Hartley is an at-will employee. He was not a tenured professor. He did not have a term contract. . . . So that segues into, and the meat of the matter is, the retaliation claim. And that's why I said the dates were important. . . . June 30th, Dr. Dahmes gives him a glowing report; writes a letter of recommendation for him. On August 2nd of 2018, he received the notification that he wasn't going to be interviewed and that kind of got the ball rolling. Now the protected activity, you argued to the Court, occurred on August 15th wherein he indicated that there may be a Title 7 violation of his employment status. That got that ball rolling. And then I had to look carefully at what transpired after August 15th. The e-mail from Dr.— and apparently from the 15th through the 21st when the meeting took place, there was some e-mail activity with Dr. Dahmes and Dr. Landry. . . . But if Dr. Hartley started his antisocial behavior on August 2nd, within two weeks he potentially generated a basis to have an employee counseling session, at bear minimum, as to being insubordinate or rude or obnoxious . . . , which potentially starts to take away any kind of pretextual argument. So the argument was made that it's a *but for*, but the "but" apparently started August 2nd; the "for" didn't come until almost two weeks later, August 15th. So I don't find a basis for the retaliation claim on that basis.

him. We separately address each of Dr. Hartley's arguments: temporal proximity and inconsistency in stated grounds for termination.[19]

Temporal Proximity

Dr. Hartley contends that the temporal proximity between his discrimination complaint and his termination supports a finding of causation. The jurisprudence, however, has recognized that temporal proximity alone is insufficient; instead, temporal proximity is simply one factor to be weighed "in the entire calculation of whether [the plaintiff] ha[s] shown a causal connection between the protected activity and the subsequent firing." *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992). Moreover, the jurisprudence has recognized that an employee's misconduct may break the causal link between the protected activity and the subsequent termination. *Schoebel v. Am. Integrity Ins. Co. of Florida*, 8:14-cv-426-T-27AEP, 2015 WL 4231670, at *2 (M.D. Fla. July 10, 2015) (observing that "intervening acts of misconduct can break the causal connection (if any) between protected activity and an adverse employment action"). Such is the case here.

Dr. Hartley's own misconduct, as University contends, is a superseding event that broke the causal link between his protected conduct—his August 2018

---

[19] Dr. Hartley also argues that the "cat's-paw" theory supports his retaliation claim. Under that theory, if an employee demonstrates a co-worker with a retaliatory motive had influence over the ultimate decision makers, the co-worker's retaliatory motive may be imputed to the ultimate decision makers, thereby establishing a causal link between the protected activity and the adverse employment action. *See Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004). But the trial court did not address the "cat's-paw" theory because it was raised for the first time in Dr. Hartley's sur-reply. As discussed elsewhere in this opinion, the governing statutory provision—La. C.C.P. art. 966(B)—does not permit a sur-reply. We, thus, decline to address the "cat's-paw" theory for the first time on appeal.

email reporting a suspected EEOC violation (the discrimination complaint)—and his November 2018 termination.[20] Dr. Hartley's misconduct that broke the causal link is documented in an email that he sent to his supervisor, Dr. Dahmes, on September 7, 2018 (the "Email"). In the Email, Dr. Hartley announces his refusal to attend a mandatory, work-related meeting (the "Meeting").

University's employee handbook provides that attendance at a work-related meeting is mandatory; the handbook provides that "[o]n occasion, we may request that you attend a University sponsored meeting. If this is scheduled during your regular working hours, your attendance is required." The mandatory nature of attendance at a work-related meeting is reinforced by Ms. Watts, University's HR Director. In her affidavit, Ms. Watts attests that "[n]ot only is this [attendance requirement] explained in the Employee Handbook, it is also a practiced custom known by the employees at [University]."

Attempting to create a factual dispute regarding the mandatory nature of the Meeting, Dr. Hartley contends that his supervisor, Dr. Dahmes, sent an Outlook calendar invitation for the Meeting. Continuing, he contends that because Dr. Dahmes used an Outlook calendar invitation, he had the option of not attending the Meeting—to reply by selecting "Yes" or "No" on attendance. Based on this characterization of Dr. Dahmes' invitation email, he contends that Dr. Dahmes never mandated he attend the Meeting. This argument is unpersuasive.

---

[20] As discussed elsewhere in this opinion, Dr. Hartley filed his EEOC complaint after he was terminated from employment.

Neither Dr. Hartley nor University was able to produce an actual copy of Dr. Dahmes' invitation email. The format the invitation email took, however, is irrelevant. Dr. Hartley's response to the invitation email in the Email sufficiently establishes both the mandatory nature of the Meeting and Dr. Hartley's insubordination in refusing to attend; the Email reads as follows:

> I received your message that the Academic Focus Areas meeting is starting early. I am not going to attend. I think that my non-attendance is a good thing, and I wanted to explain why.
>
> Your invitation email indicates that this meeting will involve group activities around the topic of mission integration. Since [University] does not keep its promises to its employees regarding internal hiring preference, and since the institution does not rectify that failure upon being notified of same, I see only hypocrisy where you and others perhaps see mission integration. I am frankly concerned that I would be so skeptical and angry in the meeting that I would say something I might later regret. Therefore, it is in the best interest of all that I do not attend.
>
> Common decency would seem to indicate that a well-qualified internal candidate should not be brushed aside by colleagues on search committees. I'm surprised that I need to point this out, or that we need to be grappling with this issue through lawyers.

Noticeably absent from the Email is any indication that Dr. Hartley viewed his attendance at the Meeting as optional. Nor does the Email include a request by Dr. Hartley to be excused from his obligation, as part of his work-related duties, to attend the Meeting. Instead, in the Email, Dr. Hartley announces his refusal to attend the Meeting; his refusal amounted to insubordination.

The Email establishes that University had a legitimate, non-discriminatory reason to terminate Dr. Hartley's employment. As a commentator has observed, "[a]bsent egregious circumstances, an employee has no right to be insubordinate or to act unprofessionally"; and "[e]ven when the employee refuses to follow

19

instructions in an effort to defuse a situation, such as failing to attend a required meeting, the disobedience rather than the mitigation is the operative fact." Andrew J. Ruzicho, Louis A. Jacobs, and Andrew J. Ruzicho II, 1 EMPLOYMENT PRACTICES MANUAL § 6B:8 (internal footnote omitted).[21] Stated differently, simply because an employee engages in a protected activity does not shelter the employee from termination for a subsequent refusal to perform his or her job—insubordination.[22] The Email documents Dr. Hartley's insubordination—work-place misconduct. Dr. Hartley's work-place misconduct is the superseding event that broke the causal link between his protected activity and his termination.

Inconsistency in Stated Grounds for Termination

Dr. Hartley's other argument is that Dr. Landry's allegedly inconsistent explanations for terminating him support a finding of causation. The jurisprudence has recognized that "a plaintiff may establish the connection [between the plaintiff-employee's protected activity and the defendant-employer's adverse employment action] by showing that the employer gave inconsistent reasons for terminating the

---

[21] The commentator, in support of this statement, cites *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 666, 98 Fair Empl. Prac. Cas. (BNA) 1206 (7th Cir. 2006). In that case, the court observed that "[the employee] Tomanovich also admits that he refused to attend a November 4, 2002, meeting with Salem to review his performance. Tomanovich claims he decided it was best not to attend the meeting so as to avoid a confrontation. That, however, was not Tomanovich's decision to make, and his admission to the conduct at issue prevents him from establishing that he was meeting the City's legitimate expectations." *Id.*

[22] *See Strong v. Univ. Healthcare Sys., L.L.C.,* 482 F.3d 802, 808 (5th Cir. 2007) (observing that "[e]mployers are sometimes forced to remove employees who are performing poorly, engaging in improper work conduct, or severely disrupting the workplace"); *Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735-36 (8th Cir. 2009) (observing legitimate reasons for termination included that employee was "insubordinate on multiple occasions, refused to attend meetings or address the complaints about his behavior, and generally acted in a very unprofessional manner").

employee." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).

Dr. Hartley's reliance on this principle here, however, is misplaced.

The record reflects that Dr. Landry made the following three statements regarding the grounds for termination of Dr. Hartley:

- In his deposition, Dr. Landry testified that Dr. Hartley was terminated because there was a "general degradation of not only his ability to work with colleagues and get his job description fulfilled but his colleagues in general, over that interview process [meaning the ELP interview search process] became more disenchanted with him" and that "it wasn't specifically, any one specific thing";

- Dr. Landry later attested in his affidavit that he terminated Dr. Hartley based on "acts of insubordination and creation of an unacceptable work environment for those working with him"; and

- At the termination meeting, which Dr. Hartley taped, Dr. Landry stated that he terminated Dr. Hartley because he knew that Dr. Hartley had not "been happy here," and that the University had come to the position that it had to deal with "this," and that Dr. Hartley should "do whatever [he had] to do."

Contrary to Dr. Hartley's contention, Dr. Landry's stated grounds—albeit worded differently, made in different formats, and given at different times—are not inconsistent. Dr. Landry consistently stated that Dr. Hartley was terminated because of his work-place misconduct, which began after he was not selected to interview for the ELP position. Given Dr. Hartley's termination was based on his work-place misconduct, not his protected activity, the trial court did not err in dismissing his retaliation claim.

## Louisiana Contract Law Claim

Dr. Hartley contends that he entered into an employment contract with University and that University breached the contract by acting in bad faith. This contract law claim requires proof of an employment contract. As noted elsewhere

in this opinion, the trial court found, agreeing with University, that Dr. Hartley was an "at-will" employee without a binding employment contract. In support of his position that the trial court erred in so finding, Dr. Hartley makes two arguments.

Dr. Hartley first argues that University's offer and acceptance letter for his administrative-staff position as Director of Grant Initiatives created a binding employment contract. This court rejected a similar argument in *Green v. Univ. of New Orleans,* 98-1809, p. 4 (La. App. 4 Cir. 6/2/99), 740 So.2d 195, 197. There, this court affirmed the trial court's finding that a letter that "merely confirmed the offer of employment to [the employee] . . . was not an employment contract." *Id.* The same is true here.

Dr. Hartley's second argument is that University's employee handbook that he signed when he was hired created an employment contract. This court rejected a similar argument in *Stanton v. Tulane University of Louisiana*, 00-0403, p. 13 (La. App. 4 Cir. 1/10/01), 777 So.2d 1242, 1250. In so doing, we enumerated the following principles:

- "The contention that a handbook creates a contract between an otherwise 'at will' employee and his employer is neither novel nor, in this jurisdiction, meritorious." *Id.* "Louisiana recognizes a presumption favoring at will employment." *Id.*

- "There are no Louisiana cases holding that employee manuals, policies, or grievances procedures confer any contractual rights upon employees or create any exceptions to the 'employment at will' doctrine." *Id.* (quoting *Mix v. The Univ. of New Orleans*, 609 So.2d 958, 964 (La. App. 4th Cir. 1992)); and

- "Louisiana jurisprudence clearly and unequivocally upholds the principle that this sort of employment handbook is not a contract such as would eliminate application of the employment at will doctrine." *Stanton*, 00-0403, p. 15, 777 So.2d at 1251; *see also Hartz v. Adm'rs of Tulane Educ. Fund,* 275 Fed. Appx. 281, 289 (5th Cir. 2008).

The principles this court articulated in *Stanton* apply here. Dr. Hartley's contention that University's employee handbook created an employment contract lacks merit. University's employee handbook provides that it has been written "to serve as a guide for the employer/employee relationship." It also includes a provision requiring that the employee acknowledge, among other things, the following: (i) that the employee is employed on an "at-will" basis, which means that either University or the employee may terminate the employment at any time, with or without cause; and (ii) that the employee understands that nothing in the employee handbook in any way changes the employee's "at-will" status. Given the lack of an employment contract between Dr. Hartley and University, Dr. Hartley cannot succeed on a breach of contract claim. The trial court did not err in dismissing the Louisiana contract law claim.

## Louisiana Tort Law Claims

Dr. Hartley raises two tort law claims—defamation and negligence. We separately address each tort law claim.

*Defamation*

Under Louisiana law, a plaintiff is required to establish four elements to establish a defamation claim: (i) a false and defamatory statement concerning another; (ii) an unprivileged publication to a third party; (iii) fault—negligence or greater—on the publisher's part; and (iv) resulting injury. *See Alexander v. La. State Bd. of Private Investigator Exam'rs*, 15-0537, 15-0708, p. 28 (La. App. 4 Cir.

23

2/17/17), 211 So.3d 544, 563 (citing *Costello v. Hardy*, 03-1146, p. 12 (La. 1/21/04), 864 So.2d 129, 139).

Dr. Hartley's defamation claim is based on an October 24, 2018 email; Dr. Dahmes sent the email to University's head of security—Marshall Pierre—and University's Vice President of Student Affairs—Meredith Reed. [23] In the email, Dr. Dahmes stated that Dr. Hartley is "more comfortable confronting women." That same day, Mr. Pierre sent an email to campus police requesting an increase of police presence in the HR office area. The trial court found the publication requirement for defamation was lacking; there was no publication because the communication between University's executives and employees was privileged and, thus, not defamatory.[24] We agree.

"[C]ommunications between appropriate persons within the employer's walls, concerning allegations of conduct by an employee that bears on the employer's interest, are subject to the qualified privilege if made in good faith." *Martin v. Lincoln Gen. Hosp.*, 588 So.2d 1329, 1333 (La. App. 2d Cir. 1991)

---

[23] A copy of the email was sent to Dr. Hartley's attorney.

[24] Addressing the defamation claim, the trial court, in its oral reasons for judgment, observed:

> But obviously the first thing you have to have is falsity. Well, there's really a dearth of testimony regarding his attitude toward women, so the falsity of it, not clearly established, but not clearly not established. That's kind of a wash from a proof standpoint that I ascertained. The publication, now that tier gave me a little bit of pause because it was not widely publicized. It was not published, not a blast e-mail to everybody at the university or even all the staff members, was not covered in media, was not anything like that. It was notification to members of the executive staff of the university and the security. And again, harkening back to his behavior, especially the comment that he made about *I didn't want to attend the meeting because I couldn't trust what I might do*, and I'm paraphrasing the comment, but that would give people some pause it might be disruptive or possibly even dangerous. So if there is a danger, then the thing you have to do is notify security. I think that's a good basis for that. So, I don't find that there is a cause of action for defamation.

(citations omitted). "Good faith," in this context, means that "the person making the statement must have reasonable grounds for believing that it is true and he must honestly believe that it is a correct statement." *Williams v. Touro Infirmary*, 578 So.2d 1006, 1010 (La. App. 4th Cir. 1991) (citations omitted). When the qualified privilege applies, "statements between employees, made within the course and scope of their employment, are not statements communicated or publicized to third persons so as to constitute a publication." *Danna v. Ritz-Carlton Hotel Co.*, 15-0651, p. 11 (La. App. 4 Cir. 5/11/16), 213 So.3d 26, 34 (citing *Doe v. Grant*, 01-0175, p. 8 (La. App. 4 Cir. 1/29/03), 839 So. 2d 408, 416).

Dr. Dahmes sent the allegedly defamatory email only to University employees.[25] Moreover, she sent the email in the course and scope of her employment. And, the record supports the trial court's finding that Dr. Dahmes sent the email in good faith. *See Williams*, *supra*. As the trial court observed in its reasons for judgment, the finding of Dr. Dahmes' good faith is supported by Dr. Hartley's comment in his September 7, 2018 email regarding the Meeting (referred to elsewhere in this opinion as the "Email") that he "didn't want to attend the [M]eeting because [he] couldn't trust what [he] might do." For these reasons, the trial court did not err in dismissing Dr. Hartley's defamation claim.

---

[25] Dr. Hartley points out his attorney was copied on the email. But, it is undisputed that at the time the email was sent—October 2018—Dr. Hartley had retained an attorney regarding this matter. Thus, Dr. Dahmes' sending a copy of the email to Dr. Hartley's attorney did not constitute publication. Dr. Hartley's attorney was not a third party. *See Jase v. City of New Britain*, HHBCV054007098, 2008 WL 5481284, at *5 n.2 (Conn. Super. Ct. Dec. 4, 2008) (*unpub.*) (observing that when the original of the letters went to plaintiff with a copy of letters to plaintiff's attorney, "[t]he communications to [plaintiff's attorney] cannot satisfy the 'publication' requirement, as they do not constitute publication to a third party").

*Negligence*

Dr. Hartley's second tort claim is a negligence claim. Dismissing this claim, the trial court found that the employer-employee relationship—the exclusive remedy rule of workers' compensation ("WC") law[26]—barred any negligence claim.[27] On appeal, Dr. Hartley points out that WC immunity does not exclude an employer's vicarious liability for its employee's intentional acts. *See* La. C.C. art. 2320; *Baumeister v. Plunkett*, 95-2270, pp. 3-4 (La. 5/21/96), 673 So.2d 994, 996. Dr. Hartley contends that University is liable under a negligent supervision theory for Dr. Dahmes' wrongful actions and discriminatory animus. University counters that WC law is the exclusive remedy here and that WC law bars an employee's negligence claim, even in the context of discrimination claims that do not result in bodily injuries. *See Tumbs v. Wemco, Inc.*, 97-2437 (La. App. 4 Cir. 4/22/98), 714 So.2d 761.

Here, Dr. Hartley's petition pled a negligence claim. Simply pleading a La. C.C. art. 2315 negligence claim is insufficient to encompass intentional acts. *Gonzales v. T. Baker Smith, LLC*, CIV.A. 13-644-SDD-RLB, 2014 WL 905281, at *2 n.18 (M.D. La. Mar. 7, 2014). As the federal district court in *Gonzales* observed, "[p]laintiffs' suggestion that, by alleging a violation of La. C.C. art. 2315, they have sufficiently pled all delicts under *respondeat superior*, which encompasses both intentional and negligent acts, is without merit." *Id.* The federal

---

[26] *See* La. R.S. 23:1032.

[27] Addressing the negligence claim, the trial court, in its oral reasons for judgment, observed that "[t]he last [claim] was the negligence [claim] against Dr. Dahmes. I don't assign any merit to that claim because, again, that harkens back to the employee/employer relationship."

district court emphasized that "[plaintiffs] have failed to plead that these particular Defendants committed intentional torts in their *Complaint*." *Id.* Such is the case here. Given that Dr. Hartley pled only a negligence claim against University, the trial court correctly concluded that WC law immunity applies and correctly dismissed Dr. Hartley's negligence claim.

## **DECREE**

For the foregoing reasons, the judgment of the trial court is affirmed.

**AFFIRMED**